[No. A0042797. First Dist., Div. Three. Oct. 31, 1989.]

GEORGE HARDEN, Plaintiff and Respondent, v.
SAN FRANCISCO BAY AREA RAPID TRANSIT DISTRICT et
al., Defendants and Appellants.

[Opinion certified for partial publication.*]

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exceptions of parts V and VI.

COUNSEL

James W. Rosenquist for Defendants and Appellants.

Allan J. Lipney for Plaintiff and Respondent.

OPINION

MERRILL, J.—San Francisco Bay Area Rapid Transit District (BART) and Benjamin K. Dabalos (Dabalos), defendants below, appeal from a judgment entered against them following a jury verdict finding them liable for false arrest and imprisonment of respondent George Harden (Harden). We affirm.

I

Harden, a Black man, first came to work for BART as a police officer on or about September 25, 1972. Prior to that time, Harden had worked in the military police as an enlistee in the Air Force (1961-1969), and as a deputy in the Alameda County Sheriff's Department (1969-1972).

Evidence was offered to show that while he was employed by the BART Police Department, Harden was subjected to racially motivated harassment by some of his superior officers, particularly Captain Tommy Sowell. Harden had difficulties obtaining promotions or raises despite the fact that his work received very positive evaluations from other supervisorial personnel. Over the course of Harden's employment with BART, Sowell had instigated several investigations of Harden. None of these investigations resulted in any criminal findings or charges being brought against Harden. Several BART police officers who supervised Harden during his employment with the BART Police Department testified that they considered him to have been a competent policeman who performed his duties in a very satisfactory manner.

In 1977, while still working as a BART policeman, and having given the required notice to BART, Harden started a part-time typewriter repair business known as Office Spectrum. Harden testified that sometime thereafter he began receiving telephone inquiries asking if he purchased used typewriters. In order to make sure that any typewriters he purchased had not been stolen, Harden began the practice of asking inquirers for the serial

numbers of the used typewriters offered for sale. Harden would tell such inquirers to call back at a later time. He would then check the serial numbers using BART computer access to the Police Information Network (PIN) to determine if they belonged to stolen typewriters. He testified it was his practice to run a given serial number through PIN twice over a period of several days in an attempt to verify that the typewriter to which it applied had not been stolen.

Although some of the serial numbers revealed that certain typewriters had in fact been stolen, Harden claimed that he never had possession of a typewriter that was shown by PIN to have been stolen; he never had knowledge of the physical location of such a typewriter; and neither he nor any employee of his ever had the telephone number of any person who gave the serial number of a typewriter that was revealed by PIN to have been stolen.

In December 1981, Captain Sowell promulgated an order prohibiting the use of the PIN by BART officers for their personal use. Up to this point, there was no policy or regulation preventing the use of PIN by officers for personal purposes. In May 1982, Lieutenant Leo Tamisiea, a BART police officer in charge of dispatchers, was advised by a dispatcher that Harden had been asking for various serial numbers to be run on PIN. Tamisiea told this to Sowell, who directed him to report it to Dabalos for investigation. Sergeant Dabalos was the BART police officer in charge of internal investigations of suspected misconduct by BART police. Dabalos and Sowell, who were close personal friends and lived near each other, drove together to work in a BART police car several times a week.

Tamisiea told Dabalos to contact the California Department of Justice (DOJ) to retrieve computer records of inquiries run through PIN by the BART Police Department concerning office equipment. In response to his inquiry, the DOJ sent Dabalos a list of 20 PIN inquiries which had been made over the period of the first 2 weeks of May 1982. The 20 inquiries were for 10 serial numbers, each one of which was run through the system twice. Four or five of the inquiries received responses indicating that they corresponded to stolen machines. Dabalos ascertained from the respective police agencies that these were still active cases. Contrary to usual practice, Dabalos did not check with Harden regarding the investigation. Both Dabalos and Sowell assumed that since Harden had run the serial numbers of stolen typewriters through PIN, he either knew the whereabouts of the stolen typewriters, knew who possessed them, or had them in his own possession. Dabalos tried unsuccessfully to get a BART police dispatcher who had made PIN inquiries on Harden's behalf, to purchase a stolen

typewriter from Harden. The dispatcher checked with his union representative, who advised him not to cooperate in this manner with Dabalos.

At some point in June 1982, Dabalos's investigation of Harden was suspended for reasons not fully explained. Meanwhile, the Hayward Police Department commenced its own investigation of Harden in July 1982, on the basis of a telephone call from a customer who had purchased a suspicious typewriter from Harden's repair company.[1] Detective Stephen Kirkland of the Hayward Police Department served a search warrant on Office Spectrum and took the serial numbers of all typewriters and other office equipment located on the premises.[2]

A third independent investigation was launched by the Oakland Police Department in mid-August 1982, on the basis of information from a confidential informant. At this point, the three separate police entities (BART, Hayward and Oakland) learned of their concurrent investigations. On August 16, 1982, Dabalos met with representatives of the Oakland Police Department, including Sergeant Ignatius Chinn. According to the declaration made by Chinn, as well as his deposition testimony, at this meeting Dabalos told him that Harden had used BART computers to run the serial numbers of office equipment *in Harden's possession,* and that "as a consequence of running those serial numbers, Mr. Harden had received information that some of the equipment *in his possession* had been reported stolen." (Italics added.) According to the trial testimony of Chinn and Dabalos, on the other hand, Dabalos only told the Oakland officers that he had learned through his investigation that some of the serial numbers Harden had run through BART's PIN computer had been reported stolen.

On the evening of August 16, 1982, the Oakland Police Department performed an undercover operation at Harden's store in an attempt to arrange a purchase of stolen property. The results of this operation were inconclusive and confusing. Although one typewriter was subsequently

---

[1] The customer suspected the typewriter to have been stolen because of shattered window glass found inside by a repairman when the typewriter malfunctioned. The police were only able to ascertain that the typewriter had been stolen by tracing it back through the manufacturer to the original purchaser of the machine. It did not show up as stolen on the PIN network because the serial number had been entered incorrectly.

[2] The results of this search were inconclusive. When the typewriter serial numbers were run through PIN, only two were reported to have been stolen. Of these, one was a typewriter owned by Harden himself which he had rented out and had reported stolen when it was not returned. When it finally was returned, the PIN report was never cleared. The other typewriter was purchased from Bekins through the wife of a BART police lieutenant. The Hayward Police Department concluded that Harden had not knowingly received stolen property when he purchased that particular typewriter.

found to be stolen, it had never been reported as such to any agency. As to other typewriters searched for or found in Harden's possession, the Oakland Police Department records contain significant discrepancies.

On August 18, 1982, Dabalos again met with members of the Oakland Police Department, at which time an arrest warrant, which had been obtained that morning, was given to the BART police to be served on Harden. Harden was arrested that same day at approximately 2 p.m., one hour before a previously arranged meeting was to have taken place in which he and his lawyer were to have reviewed potentially exculpatory evidence with Detective Kirkland of the Hayward Police Department. Two years later, the charges against Harden were dismissed by the district attorney's office for lack of evidence.

## II

Harden filed suit alleging false imprisonment and negligent and intentional infliction of emotional harm. In addition to the appellants here, the original defendants included the City of Hayward, the City of Oakland, Detective Kirkland, and Captain Sowell. A first amended complaint filed in May 1986 did not include the City of Oakland as a defendant. In January 1987, the trial court granted the motion of Kirkland and the City of Hayward for summary judgment. At the close of Harden's case as plaintiff, the remaining parties moved for nonsuit. The trial court granted defendant Sowell's motion for nonsuit as to all causes of action. As to BART and Dabalos, the motion for nonsuit was granted with regard to the causes of action for intentional and negligent infliction of emotional harm.

Pursuant to stipulation, the issues of liability and damages were bifurcated for trial. After a jury verdict in favor of Harden on liability, there was a further trial on damages. The jury awarded Harden general and special damages in the amount of $531,000 from appellants BART and Dabalos, and punitive damages of $11,000 from Dabalos alone. Judgment was entered on the jury verdict and this appeal followed.

## III

Appellants' central contention is that neither BART nor Dabalos is liable for false arrest under the facts of this case. They rely on Government Code section 821.6, which grants immunity to public employees from liability for

malicious prosecution,[3] and on Civil Code section 43.55 (former Civ. Code, § 43.5, subd. (a)), which bars a cause of action for arrest pursuant to a warrant regular on its face "if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant."[4] They urge that because of the strong public policy expressed in these statutes to protect police from liability for erroneous police reports, and because in this case the arrest warrant was regular on its face and Dabalos did not directly participate in the actual arrest, detention or imprisonment of Harden, neither Dabalos nor his employer should have been found liable for false arrest. We disagree.

■ The judgment is supported by both the applicable statutes and the case law interpreting them. Government Code section 820.4 specifically states: "A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. *Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment.*" (Italics added.) Citing this section, the Supreme Court in *Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 715 [117 Cal.Rptr. 241, 527 P.2d 865], held that "[n]o immunity provision in the California Tort Claims Act insulates the county from liability for false imprisonment" and specifically rejected the county's argument that it was immune under Government Code section 821.6. "[T]he history of section 821.6 demonstrates that the Legislature intended the section to protect public employees from liability only for *malicious prosecution* and not for *false imprisonment*. . . . [¶] . . . [S]ection 821.6 cannot be interpreted to defeat the common law liability for false imprisonment preserved in [Gov. Code] section 820.4 . . . ." (*Id.,* at pp. 719, 722, italics in original.)

■ With regard to Civil Code section 43.55, the immunity set forth therein for arrests made pursuant to a regular warrant is only conditional. A failure of any condition prevents the immunity from attaching to a public entity or employee. The applicable condition here is that the arrest must have been made *without malice.* (*McKay* v. *County of San Diego* (1980) 111

---

[3] Government Code section 821.6 provides as follows: "A public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."

[4] Former Civil Code section 43.5, subdivision (a) was renumbered as section 43.55 in 1986, at which time a nonsubstantive change was also made. (Stats. 1986, ch. 248, § 15, No. 3 Deering's Adv. Legis. Service, p. 223, No. 7 West's Cal. Legis. Service, pp. 188-189.) In its present form, the statute states as follows: "There shall be no liability on the part of, and no cause of action shall arise against, any peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face if the peace officer in making the arrest acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant."

Cal.App.3d 251, 254-255 [168 Cal.Rptr. 442].) Where the arrest is made with malice, therefore, no immunity attaches, whether or not the arrest was made pursuant to warrant or legal process.

In this case, the trial court specifically instructed the jury that pursuant to this conditional immunity, it could only find appellants liable for Harden's arrest if it also found that Dabalos "acted with malice" by "knowingly or recklessly" giving false information to the Oakland Police Department "with the intent to induce the arrest of [Harden], and that such action was a proximate cause of [Harden's] arrest." Pursuant to this instruction, which appellants do not challenge, the jury found that Dabalos acted with malice in procuring Harden's arrest. This finding was supported by substantial evidence in the record that Dabalos told Sergeant Chinn of the Oakland Police Department that Harden had physical possession of stolen typewriters and that Harden knew that these typewriters were stolen. Whether Dabalos told Chinn this information as a deliberate falsehood or merely with reckless disregard of the truth, in either case the jury could find that Dabalos's act was malicious. (*Laible* v. *Superior Court* (1984) 157 Cal.App.3d 44, 47, 53 [203 Cal.Rptr. 513]; *McKay* v. *County of San Diego, supra,* 111 Cal.App.3d at p. 255.)

The fact that the arrest was made by a BART officer other than Dabalos does not render Dabalos immune from liability for false arrest under the particular facts of this case. "All who take part in or assist in the commission of a false imprisonment are joint tort feasors, and may be joined as defendants without an allegation or proof of a conspiracy. [Citations.]" (*Oppenheimer* v. *City of Los Angeles* (1951) 104 Cal.App.2d 551, 553 [232 P.2d 30].) " '. . . [A] party who "authorizes, encourages, directs or assists an officer to do an unlawful act, or procures an unlawful arrest, without process, or participates in the unlawful arrest or imprisonment, is liable." [Citations.]' [Citation.]" (*Du Lac* v. *Perma Trans Products, Inc.* (1980) 103 Cal.App.3d 937, 941 [163 Cal.Rptr. 335]; BAJI No. 7.60 (7th ed. 1986).) ■ Although an informant's good faith and honesty may give immunity from liability where an arrest occurs based on faulty information, "a different rule controls when an arrest occurs because the defendant knowingly gave the police false or materially incomplete information, of a character that could be expected to stimulate an arrest. Such conduct instigates, encourages, and invites the arrest that follows; hence, such conduct can be a basis for imposing liability for false imprisonment. [Citations.]" (*Du Lac* v. *Perma Trans Products, Inc., supra,* 103 Cal.App.3d at p. 942.)

■ That was the situation in this case, where the jury found that Dabalos's false statements to Officer Chinn of the Oakland Police Depart-

ment were intended to induce Harden's arrest and in fact directly encouraged, instigated and incited Harden's subsequent arrest. The record fully supports this finding. Dabalos took an active role in accomplishing Harden's arrest. Dabalos met with Chinn on August 16, 1982, at which time he told Chinn that Harden had stolen office equipment "in his possession." Two days later, on August 18, Dabalos again met with Chinn and with other members of the Oakland Police Department. As appellants concede, the purpose of this meeting was to receive an arrest warrant and to have it served on Harden. The warrant was passed on to Sergeant Lynch of the BART Police Department to be served, and was in fact served that afternoon on Harden. ▮▮ ▮▮ ▮▮ ▮▮ ▮▮ Thus, Dabalos did participate directly in the actual arrest, detention and imprisonment of Harden; not only did he pass false information to the Oakland Police Department with malice, but he directly and actively participated in obtaining the arrest warrant and in having it served on Harden by BART police, thus bringing about the unlawful arrest.[5]

Appellants urge however that liability for false arrest can attach only to an individual who, acting with malice, actually *personally arrests* the plaintiff. Here, because the arrest warrant was regular on its face and referred to Harden, and because the arrest itself was made by a police officer other than Dabalos, appellants argue that the actions of Dabalos present at most a case of malicious prosecution for which appellants are immune under Government Code section 821.6.

We are aware that the distinction between malicious prosecution and false arrest is not always easy to discern. (*Scannell* v. *County of Riverside* (1984) 152 Cal.App.3d 596, 607 [199 Cal.Rptr. 644]; *Collins* v. *City and County of San Francisco* (1975) 50 Cal.App.3d 671, 676-677 [123 Cal.Rptr. 525].) Nevertheless, the Legislature recognized this distinction when it specifically made public employees immune from liability for malicious prosecution, but *denied* them immunity for false arrest or imprisonment. (Gov. Code, §§ 820.4, 821.6; *Sullivan* v. *County of Los Angeles, supra,* 12 Cal.3d at pp. 717-722.) Appellants would have us hold that where a public employee

---

[5] "To constitute liability for false imprisonment, defendants' false statements knowingly made to police must have been made with the *intent* to induce an arrest. '[T]he actor is not liable unless his act is done for the purpose of imposing confinement upon the other, or with knowledge that such a confinement will, to a substantial certainty, result from it. It is not enough that the actor realizes or should realize that his actions involve a risk of causing a confinement, so long as the likelihood that it will do so falls short of a substantial certainty.' [Citations.]" (*Du Lac* v. *Perma Trans Products, Inc., supra,* 103 Cal.App.3d at p. 943, italics in original.) This element of intent was unquestionably satisfied here. Dabalos's statements and actions were all knowingly aimed at securing Harden's arrest.

personally obtains an otherwise valid warrant under due process of court, but with malice and without probable cause and on the basis of false statements of facts, the only action which may be stated is one for malicious prosecution unless the employee personally arrests or imprisons the victim with his or her own hands.

■ But the two causes of action, although distinct, are not necessarily mutually exclusive. A cause of action for false arrest or imprisonment may lie where the same facts also support a cause of action for malicious prosecution. (*McKay* v. *County of San Diego, supra,* 111 Cal.App.3d at pp. 255-256.) We recognize that under the facts of a given case, the distinction between malicious prosecution and false arrest—and with it, the existence of statutory immunity—may depend on whether or not the defendant charged with maliciously instituting the prosecution personally also made the arrest. (*Coverstone* v. *Davies* (1952) 38 Cal.2d 315 [239 P.2d 876]; *Dawson* v. *Martin* (1957) 150 Cal.App.2d 379 [309 P.2d 915].) ■ Nevertheless, in a case such as that before us, where the public employee took a very active role in actually securing the arrest warrant and participated in having it served by a fellow police officer under his own authority, we conclude that no public policy would justify extending immunity. It would be absurd to hold Dabalos, and vicariously BART, liable for false arrest and imprisonment if Dabalos had actually served the arrest warrant he had maliciously secured, but grant immunity on the basis that the arrest warrant was served at his direction by a fellow officer.

## IV

■ Appellants contend that even if a cause of action for false arrest does lie against them under the circumstances presented here, "there is . . . no evidence" that Dabalos's actions and statements to Chinn proximately caused the issuance of the arrest warrant. They point to the fact that Chinn had already undertaken an independent investigation of Harden based on information from a confidential informant about allegedly stolen typewriters in Harden's possession. Appellants' contention is meritless. Aside from the many discrepancies in the evidence surrounding these typewriters rendering the information of doubtful value, the question of proximate cause is ordinarily a factual one to be decided by the jury. (*Bigbee* v. *Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947]; *Hoyem* v. *Manhattan Beach City Sch. Dist.* (1978) 22 Cal.3d 508, 520 [150 Cal.Rptr. 1, 585 P.2d 851]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 967, pp. 356-358.) Here, the facts were obviously in dispute, and it is not our role to weigh them. The jury's conclusion that Dabalos's involve-

ment proximately caused Harden's arrest is supported by substantial evidence.

### V, VI*

. . . . . . . . . . . . . . . . . . . .

### VII

The judgment is affirmed.

White, P. J., and Strankman, J., concurred.

A petition for a rehearing was denied November 30, 1989, and appellants' petition for review by the Supreme Court was denied January 18, 1990.

---

* See footnote, *ante,* page 7.