Humberto ALVAREZ–MACHAIN,
Plaintiff–Appellant,

v.

UNITED STATES of America; Hector
Berellez; Bill Waters; Pete Gruden;
Jack Lawn; Antonio Garate–Busta-
mante; Francisco Sosa, and five un-
named Mexican nationals currently in
the federal witness protection pro-
gram, Defendants–Appellees.

Humberto Alvarez–Machain,
Plaintiff–Appellee,

v.

Francisco Sosa, and five unnamed Mexi-
can nationals currently in the federal
witness protection program, Defen-
dants–Appellants.

Nos. 99–56762, 99–56880.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 2001

Filed Sept. 11, 2001

Charles S. Leeper, Spriggs & Hollingsworth, Washington, D.C., for appellant/appellee Sosa.

Robert M. Loeb, Department of Justice, Washington, D.C., for appellee/appellant United States of America.

Hamish P.M. Hume, Cooper, Carvin & Rosenthal, Washington, D.C., for appellees Lawn, Gruden, Waters and Berellez.

Paul Hoffman, ACLU, Los Angeles, California, for appellee/appellant Alvarez–Machain.

William J. Aceves, California Western School of Law, San Diego, for amici curiae International Human Rights Organizations and International Law Scholars.

John P. Schnitker, Department of Justice, Washington, DC, for amicus curiae United States of America.

Before: SCHROEDER, Chief Judge, GOODWIN, Circuit Judge, and KING,[1] District Judge.

GOODWIN, Circuit Judge:

The appeal and cross-appeals in this case challenge a number of rulings in the litigation which followed the arrest of Humberto Alvarez–Machain ("Alvarez") at his office in Guadalajara by Mexican civilians, including Jose Francisco Sosa ("Sosa"), at the behest of United States Drug Enforcement Agency ("DEA") agents.

## FACTUAL & PROCEDURAL BACKGROUND

Alvarez is a medical doctor. He practices in Guadalajara, Jalisco, Mexico. In February, 1985, DEA Special Agent Enrique Camarena–Salazar ("Camarena") was abducted and brought to Guadalajara, tortured, and murdered. Alvarez was present at the house where Camarena was held. In 1990 a federal grand jury in Los Angeles indicted Alvarez for his involvement in the incident, and a warrant was issued for his arrest. DEA Headquarters approved the employment of Mexican nationals to apprehend Alvarez in Mexico and to bring him to the United States. The DEA hired Garate–Bustamente ("Garate"), a Mexican informant, to contact Mexican nationals whom he believed could help in apprehending Alvarez in Mexico. Garate contacted a Mexican businessman, Ignacio Barragan ("Barragan") to assist in the operation. In March, 1990, Barragan asked a former Mexican policeman, Sosa, to participate in Alvarez's apprehension. Barragan told Sosa that the DEA had a warrant for Alvarez's arrest, would pay the operation's expenses, and, if he succeeded in bringing Alvarez to the United States, would recommend Sosa for a Mexican government position.

On April 2, 1990, Sosa and others apprehended Alvarez at his office and held him overnight at a motel. The next day, they flew Alvarez to El Paso, Texas, where federal agents arrested him. Less than

1. Honorable Samuel P. King, Senior United States District Judge, for the District of Hawaii, sitting by designation.

twenty-four hours passed between Alvarez's apprehension in Mexico and his transfer to federal custody in El Paso.

Alvarez was brought to Los Angeles for trial and remained in detention from April 1990 until December 1992. Alvarez argued that the federal courts lacked jurisdiction to try him because his arrest violated the United States–Mexico Extradition Treaty. *See United States v. Caro–Quintero,* 745 F.Supp. 599, 601 (C.D.Cal. 1990). The district court and the Ninth Circuit agreed with him, *see id.* at 614 and *United States v. Alvarez–Machain,* 946 F.2d 1466, 1466–67 (9th Cir.1991), but the Supreme Court disagreed and remanded the case for trial. *See United States v. Alvarez–Machain,* 504 U.S. 655, 669–70, 112 S.Ct. 2188, 119 L.Ed.2d 441 (1992). Alvarez was acquitted, *see Alvarez–Machain v. United States,* 107 F.3d 696, 699 (9th Cir.1996), and he returned to Mexico.

On July 9, 1993, Alvarez filed this action in which he asserted against the United States, Sosa, Garate, five unnamed Mexican civilians, and DEA agents Jack Lawn, Peter Gruden, William Waters, and Hector Berrellez the following claims: (1) kidnaping, (2) torture, (3) cruel and inhuman and degrading treatment or punishment, (4) arbitrary detention, (5) assault and battery, (6) false imprisonment, (7) intentional infliction of emotional distress, (8) false arrest, (9) negligent employment, (10) negligent infliction of emotional distress, and (11) various constitutional torts. The defendants moved to dismiss the complaint. The district court in 1995 granted the motion in part and denied the motion in part. We affirmed in part, reversed in part, and remanded the matter to the district court. *See Alvarez–Machain,* 107 F.3d at 701.

On summary judgment, the district court entered a judgment against Sosa for kidnaping and arbitrary detention under the Alien Tort Claims Act ("ATCA"). The

district court held that Alvarez could recover damages only for his detention prior to his arrival in the United States, applied United States rather than Mexican damage laws, and awarded Alvarez $25,000. The district court substituted the United States for the DEA agents and dismissed Alvarez's Federal Tort Claims Act ("FTCA") claims. Alvarez has appealed the district court's decision to substitute the United States for the DEA agents and its dismissal of his FTCA claims of false arrest, false imprisonment, kidnaping, and intentional and negligent infliction of emotional distress. He also appeals the district court's decision to limit damages to those imposed for his imprisonment in Mexico. He has dropped his allegations of mistreatment in Mexico and in the United States and the related causes of actions. Sosa appeals the judgment against him and assigns error to the district court's choice of federal common law of damages on the ATCA claim. The parties have stipulated to the dismissal of Alvarez's case against Garate.

### Alvarez's ATCA claim

The district court found two independent grounds for sustaining jurisdiction and a claim for relief against Sosa for kidnaping under the ATCA. First, it held that state-sponsored abduction within the territory of another state without its consent is a violation of international law of sovereignty. Second, it held that state-sponsored abduction violates customary norms of international human rights law. We hold that Alvarez has standing to recover under the ATCA based only on the second ground.

### A. Meaning of "Law of Nations"

The ATCA provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort

only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350 (1993). Sosa argues on appeal that only violations of *jus cogens* norms are actionable under the ATCA. *Jus cogens* norms are "rules of international law [that] are recognized by the international community of states as peremptory, permitting no derogation. These rules prevail over and invalidate international agreements and other rules of international law in conflict with them." Restatement (Third) of Foreign Relations Law § 102, cmt. k. However, Sosa's contention that there must be a *jus cogens* violation for the ATCA to apply finds no support in cited cases. ATCA cases have held that the norm must be "specific, universal, and obligatory." *In re Estate of Ferdinand E. Marcos, Human Rights Litigation,* 25 F.3d 1467, 1475 (9th Cir.1994); *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1383 (9th Cir.1998). This Court has held that a *jus cogens* violation satisfies the "specific, universal, and obligatory" standard, *Hilao v. Estate of Marcos,* 103 F.3d 789, 795 (9th Cir.1996), but it has never held that a *jus cogens* violation is required to meet the standard. In *Martinez,* 141 F.3d at 1383, we stated that arbitrary arrest and detention were actionable under the ATCA, but did not consider whether they constituted *jus cogens.* We have recognized that the "law of nations," the antecedent to customary international law, and *jus cogens* are related but distinct concepts. *See Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714–16 (9th Cir.1991). Therefore, we reject Sosa's argument that the ATCA requires a violation of a *jus cogens* norm and decline to decide whether arbitrary detention and kidnaping reach this heightened standard.

### B. Mexican Sovereignty

■ Alvarez's claim that Sosa should be liable under the ATCA because his kidnap-ing violated Mexican territorial sovereignty fails. Alvarez lacks standing to sue for the violation. The Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements:" (1) an " 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical,' " (2) a "causal connection between the injury and the conduct complained of the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court,' " and (3) the likeliness that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal citations omitted). Alvarez's abduction does not satisfy the *Lujan* test, because Alvarez does not have a legally protected interest in Mexican sovereignty. As the Fifth Circuit has explained, "it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress." *United States v. Zabaneh,* 837 F.2d 1249, 1261 (5th Cir.1988) (discussing an individual's lack of standing to sue for a violation of an international treaty). Only Mexico has standing to object to encroachments on its territorial sovereignty.

### C. Rights to Freedom of Movement, to Remain in One's Country, and Security in One's Person

■ Alvarez's kidnaping was nonetheless a violation of the "law of nations" because it violated customary international human rights law. The Supreme Court has stated that the law of nations "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decisions recognizing

and enforcing that law." *United States v. Smith,* 5 Wheat. 153, 18 U.S. 153, 160–61, 5 L.Ed. 57 (1820); *Filartiga v. Pena–Irala,* 630 F.2d 876, 880 (2nd Cir.1980). *See also The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (stating "where there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is."). The Second Circuit also has used United Nations ("U.N.") declarations as evidence of the law of nations:

> These U.N. declarations are significant because they specify with great precision the obligations of member nations under the Charter ... Accordingly, it has been observed that the Universal Declaration of Human Rights "no longer fits into the dichotomy of 'binding treaty'" against "non-binding pronouncement," but is rather an authoritative statement of the international community.

*Filartiga,* 630 F.2d at 883. Sosa cites the Restatement of Foreign Relations law for the proposition that no human rights instrument states explicitly that forcible abduction violates international human rights law. *See* Restatement (Third) of Foreign Relations Law of the United States § 432 n. 1 (1987) ("none of the individual human rights conventions to date ... provides that forcible abduction or irregular extradition is a violation of international human rights law"). Sosa fails to mention that the Restatement continues:

> However, Articles 3, 5, and 9 of the Universal Declaration of Human Rights, as well as Articles 7, 9 and 10 of the International Covenant on Civil and Political Rights might be invoked in support of such a view. In 1981 the Human Rights Committee established pursuant to Article 28 of the Covenant decided that the abduction of a Uruguayan refugee from Argentina by Uruguayan security officers constituted arbitrary arrest and detention in violation of Article 9(1). 36 U.N. GAOR, Supp. No. 40, at 176–84 (1981), see also id. at 185–89.

*Id.*

Although no international human rights instruments refers to transborder abduction specifically, various established international human rights norms, like the rights to freedom of movement, to remain in one's country, and to security in one's person, encompass it. Neither Sosa nor the Government challenges Alvarez's standing to claim a violation of his individual human and civil rights.

■ A number of international human rights instruments, which are evidence of customary international law, see *Siderman,* 965 F.2d at 716, assert the right of an individual to liberty and security. The American Convention on Human Rights (hereinafter "American Convention") provides that "[n]o one shall be deprived of his physical liberty except for the reasons and under the conditions established beforehand by the constitution of the State Party concerned or by a law established pursuant thereto" and that "[n]o one shall be subject to arbitrary arrest or imprisonment." O.A.S. Official Records, arts. 7(2)7(3), OEA/Ser.K/XVI/1.1, Doc. 65, Rev. 1, Corr. 2 (1970) (signed but not ratified by the United States), reprinted in 9 I.L.M. 673, 676 (1970).

Alvarez's abduction occurred pursuant neither to the laws of Mexico nor to the

laws of the United States. The Universal Declaration of Human Rights (hereinafter "Universal Declaration") provides that "[e]veryone has the right to freedom of movement and residence within the borders of each State." G.A. Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N. Doc. A/810 (1948), art. 13(1). The International Covenant on Civil and Political Rights ("ICCPR") reiterates this guarantee. *See* ICCPR, art. 12, adopted Dec. 16, 1966, S. Treaty Doc. 95–2, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976, entered into force for the United States Sept. 8, 1992). By kidnaping Alvarez and taking him to the United States, Sosa encroached on his rights to freedom of movement and residence.

Regional agreements also affirm the rights of freedom of movement and residence. The American Declaration of the Rights and Duties of Man, (hereinafter "American Declaration"), arts. 1, 8, OAS Doc. OEA/Ser. L/V/II.65, Doc. 6, pp. 19–25, May 2, 1948, asserts every person's right to "liberty and security of his person, to 'fix his residence within the territory of the state of which he is a national, . . . and not to leave it except by his own will.'" The American Convention echoes the American Declaration's guarantees of the right to personal liberty and security, and the right not to be expelled from the territory of the state of one's nationality. American Convention, arts. 7, 22. *See also* Protocol No. 4 to the European Convention for the Protection of Human Rights and Fundamental Freedoms, art. 1, Nov. 22, 1984, Europ. No. 117, 24 I.L.M. 435 (1985); African Charter on Human and Peoples' Rights, art. 12, June 27, 1981, 21 I.L.M. 58, 60. Here, Sosa and his fellow kidnapers forced Alvarez to leave Mexico against his will.

Thus, we agree with the district court that Alvarez's kidnaping violated his rights to freedom of movement, to remain in his country, and to security in his person, which are part of the "law of nations."

## D. Arbitrary detention

■ Alvarez's seizure also violated the international customary legal norm against arbitrary detention. This Circuit has found a "clear international prohibition against arbitrary arrest and detention" and has held that the ATCA reaches this conduct. *Martinez*, 141 F.3d at 1384. In *Martinez*, we held that the detention was not arbitrary because it was pursuant to a valid Mexican warrant. *See id.* Alvarez argues that, under *Martinez*, his arrest and detention were arbitrary because there was no Mexican warrant or any lawful authority for his arrest. We agree.

According to *Martinez*, "detention is arbitrary if 'it is not pursuant to law; it may be arbitrary also if it is incompatible with the principles of justice or with the dignity of the human person.'" *Id.* (quoting Restatement of Foreign Relations law § 702 cmt. h). The district court held that the detention was arbitrary, because the United States warrant for Alvarez's arrest had no legal effect in Mexico, and the DEA had no legal authority for kidnaping him. A warrant issued by a United States court is valid only "within the jurisdiction of the United States." *See* Fed.R.Crim.P. 4(d)(2).

The *Martinez* court also noted: "[d]etention is arbitrary if 'it is not accompanied by notice of charges; if the person detained is not given early opportunity to communicate with family or to consult counsel; or is not brought to trial within a reasonable time.'" *Id.* Sosa argues that this statement encompasses the *Martinez* "test" for arbitrariness under international law. He does not explain how the "not pursuant to law" or "incompatible with the principles of justice or with the dignity of

the human person" statements fit into the test. It would be more accurate to treat this second statement as an illustrative, not exhaustive, list of circumstances that make a detention arbitrary.

Sosa also maintains that Alvarez's detention was not prohibited by international law because it was not "prolonged." He argues that because the plaintiff in *Martinez* was detained illegally for 59 days, *see Martinez*, 141 F.3d at 1377, and Alvarez was held for less than twenty-four hours in Mexico, his detention was not actionable. However, the *Martinez* court set no time component in its arbitrary detention rule. The Court said simply: "there is a clear international prohibition against arbitrary arrest and detention," and cited Article 9 of the Universal Declaration and Article 9 of the ICCPR, neither of which include a temporal component. *Martinez*, 141 F.3d at 1384.

A kidnaping that ends in the death of a victim may have a duration of less than an hour. The effect on the victim has nothing to do with duration of the wrongful act. Accordingly, we hold that Alvarez's detention was arbitrary and, therefore, violated the "law of nations."

### Substitution of the United States under 28 U.S.C. § 2679

■ The district court did not err in substituting the United States for the individual DEA defendants. Whether the district court erred in substituting the United States under 28 U.S.C. § 2679 is a matter of statutory interpretation and is therefore reviewed de novo. *See United States v. Juvenile Male (Kenneth C.)*, 241 F.3d 684, 686 (9th Cir.2001).

Alvarez argues that the district court erred in its January 1995 order determining that Alvarez's claims under the ATCA

were subject to substitution under the Federal Employees Liability Reform and Tort Compensation Act ("Liability Reform Act"), 28 U.S.C. § 2679 (1994). The Liability Reform Act provides that for most civil actions based on the wrongful conduct of federal employees acting within the scope of their employment, the only remedy is a FTCA lawsuit against the government itself. *See* 28 U.S.C. § 2679(b)(1) (1994). However, the exclusive remedy provision "does not extend or apply to a civil action against an employee of the Government ... which is brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B).

The district court held that an action under the ATCA was not exempt from the exclusive remedy provision of the Liability Reform Act. It reasoned that "it is international law, not the ATCA," that gives individuals fundamental rights. Therefore, a claim under the ATCA is based on a violation of international law, not of the ATCA itself.

This reading is consistent with the Supreme Court's reasoning in *United States v. Smith*, 499 U.S. 160, 111 S.Ct. 1180, 113 L.Ed.2d 134 (1991). In *Smith*, the Court rejected the argument that a claim for medical malpractice was "authorized" by the Gonzalez Act and therefore fit the 28 U.S.C. § 2679(b)(2)(B) exception for violations of a statute. The court explained: "[n]othing in the Gonzalez Act imposes any obligations or duties of care upon military physicians. Consequently, a physician allegedly committing malpractice under state or foreign law does not 'violate' the Gonzalez Act." *Smith*, 499 U.S. at 174, 111 S.Ct. 1180.[2] The same can be said of

---

**2.** The relevant provision of the Gonzalez Act provides:

the ATCA. The language of § 1350 creates no obligations or duties. Admittedly, the ATCA differs from the Gonzalez Act in that it creates a cause of action for violations of international law, whereas the Gonzalez Act limited the common law liability of doctors. *See In re Estate of Marcos,* 25 F.3d at 1475 (rejecting the argument that the ATCA is merely jurisdictional); *Abebe–Jira v. Negewo,* 72 F.3d 844, 848 (11th Cir.1996); *Filartiga,* 630 F.2d at 885–86. Nonetheless, we find nothing in this distinction to cause us to deviate from the plain language of the statute. We therefore agree with the district court that Alvarez's claims under the ATCA were subject to substitution under the Liability Reform Act. Accordingly, Alvarez's exclusive remedy against the United States, in lieu of the DEA agents, is through the FTCA.

**FTCA claims against the United States**

■ The FTCA acts as a waiver of the United States' sovereign immunity for certain torts committed by its employees. 28 U.S.C. §§ 1346(b), 2674. The statute provides that "[t]he United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674 (1994). We review *de novo* the district court's determination of subject matter jurisdiction under the FTCA. *See Brady v. United States,* 211 F.3d 499, 502 (9th Cir.) cert. denied, 531 U.S. 1037, 121 S.Ct. 627, 148 L.Ed.2d 536 (2000).

**A. The "Foreign Activities" Exception**

■ We agree with the district court that the "foreign activities" exception to

the FTCA does not apply to this case, because Alvarez asserted a valid "headquarters claim." The FTCA exempts from its coverage "any claim arising in a foreign country." 28 U.S.C. § 2680(k) (1994). This exemption "is more than a choice of law provision: it delineates the scope of the United States' waiver of sovereign immunity." *Smith v. United States,* 507 U.S. 197, 200, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993). However, creating the so-called "headquarters doctrine," the Supreme Court has held that the FTCA requires federal courts to look to the law of the place where the act took place, rather than the place where the act had its operative effect. *See Richards v. United States,* 369 U.S. 1, 10, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

The district court did not err in holding that Alvarez had stated a valid headquarters claim "with respect to his claim for false arrest/false imprisonment and intentional infliction of emotional distress from his seizure." Although the "operative effect" of Alvarez's kidnaping occurred in Mexico, all of the command decisions about his seizure and removal to the United States occurred in California. In *Leaf v. United States,* 588 F.2d 733, 735 (9th Cir. 1978), this Court held that a claim "arises, as that term is used in Sections 1346(b) and 2680(k), where the acts or omissions that proximately cause the loss take place."

■ Under California law, a person proximately causes a loss if his actions were a substantial factor in increasing the

---

"The remedy against the United States provided by [the FTCA] for damages for personal injury, including death, caused by the negligent or wrongful act or omission of any physician ... of the armed forces ... while acting within the scope of his duties or employment ... shall hereafter be exclu-

sive of any other civil action or proceeding by reason of the same subject matter against such physician ... whose act or omission gave rise to such action or proceeding."
10 U.S.C. § 1089(a) (1998).

likelihood of the loss. *See Vickers v. United States*, 228 F.3d 944, 956 (9th Cir.2000). The DEA defendants' conduct not only created the risk that Alvarez would be abducted, it was the cause in fact. According to the district court, the DEA officers:

> sought individuals who could work in Mexico to bring Plaintiff to the United States. Government employees gave explicit instructions on the person it [sic] wanted seized, the background of those who would seize him, and how those individuals should treat him during his trip to the United States. At a later stage, government employees instructed the arrest team where to fly the plane and obtained clearance for the plane to land.

Moreover, as this Court explained in *Vickers:*

> It is well established under California law that the criminal or negligent acts of a third party do not break the causal link between the defendant's conduct and the alleged injuries, if the defendant's conduct created or increased the risk of such acts.

*Vickers*, 228 F.3d at 956. The involvement of Mexicans in physically seizing Alvarez did not break the chain of causation; they merely completed the chain. The DEA's planning assured that they would kidnap Alvarez.

As the district court noted, Alvarez's claims resemble those asserted in other cases in which courts have found valid headquarters claims and refused to apply the foreign claim exclusion. For example, in a case where the failure of the DEA and Customs to coordinate an operation led to the incarceration of a number of individuals in Honduras, the Eleventh Circuit held that, although the actual arrest and injury occurred in Honduras, the negligent act or omission occurred in the United States. *See Couzado v. United States*, 105 F.3d 1389, 1394–96 (11th Cir.1997). *See also Sami v. United States*, 617 F.2d 755, 761–63 (D.C.Cir.1979) (applying headquarters doctrine to claim of false arrest where the arrest took place in Germany because the instructions to make the arrest occurred in the United States); *Donahue v. United States Dep't of Justice*, 751 F.Supp. 45, 48–49 (S.D.N.Y.1990) (allowing a headquarters claim "insofar as the act of negligence is alleged to have occurred in the United States"); *Glickman v. United States*, 626 F.Supp. 171, 174 (S.D.N.Y.1985) (holding that the "foreign country" exception did not bar an action filed by an American citizen who alleged that, while he was in Paris in 1952, a Central Intelligence Agency agent surreptitiously drugged him with LSD where the complaint alleged that the program to administer drugs to unwitting persons originated in the United States).

*Cominotto v. United States*, 802 F.2d 1127 (9th Cir.1986), a Ninth Circuit case in which the court refused to apply the headquarters doctrine, is distinguishable. In *Cominotto*, we held that the Federal Government's alleged negligence in failing to provide adequate guidance in connection with an undercover operation was not the proximate cause of the plaintiff's injuries and therefore did not fall under the headquarters doctrine. *Cominotto*, a DEA informant, violated Secret Service instructions by meeting suspects at night, entering their automobile, leaving Bangkok, and heading for a private meeting place. He was shot in the leg while "fleeing from a dangerous situation in which he had placed himself," and "was the sole and proximate cause of his injuries." *Id.* at 1130. As discussed above, nothing in Alvarez's case breaks the chain of causation. Sosa and his fellow abductors brought Alvarez to the United States pursuant to the plan of the United States government officials. The injury, Alva-

rez's false arrest, occurred as a direct and intended result of the DEA's plans. Thus, the headquarters doctrine applies.

■■■ The United States argues that the headquarters doctrine does not apply to intentional torts, but cites little support for this contention. The Government argues that "there can be no question that a court, when choosing between two states for the purposes of the FTCA, would always find that the intentional tort 'occurred' where the alleged tortious act was committed." The only case it cites is a Fifth Circuit case, *Landry v. A–Able Bonding, Inc.*, 75 F.3d 200, 205 n. 7 (5th Cir.1996), which applied Texas law to a claim of false imprisonment that took place in Texas pursuant to an arrest warrant issued in Louisiana. The *Landry* court's deciding a Texas state law claim of false imprisonment gives us little guidance in deciding a claim under the FTCA based on California law. We hold that the headquarters doctrine applies to intentional torts as well as cases of negligence and, therefore, applies to Alvarez's case.

**B. False Arrest under the FTCA**

**1. Intentional Torts Exception**

■■■ We agree with the district court that the intentional tort exception to the FTCA does not apply to Alvarez's case. The FTCA's waiver of sovereign immunity contains an exception for intentional torts, including false arrest, unless the intentional tort be committed by an "investigative or law enforcement officer." 28 U.S.C. § 2680(h) (1994). The statute defines an "investigative or law enforcement officer" as "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.* The district court held that the intentional tort exception should not apply here because Alvarez's "claim contemplates liability for the

actions of the law enforcement officers in the United States and those individuals should face liability for instructing others to do what the law enforcement individuals could not."

Although Sosa is not an officer of the United States and is not "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law," he served as an agent or instrument for DEA agents who have these powers. *See* 21 U.S.C. § 878(a)(2), (3), and (4) (1999). *See also Van Schaick v. United States*, 586 F.Supp. 1023, 1032–33 (D.S.C. 1983) (holding that a county sheriff and a city police officer were investigative or law enforcement officers within the meaning of § 2680(h), because they were agents of the Assistant United States Attorney and the DEA agent, who directed them to make the arrest and secure the aircraft for the DEA). Indeed, as the district court explained, the policy reason for the "law enforcement officer" exception to the "intentional torts" exception to the FTCA—to "provid(e) a remedy against the Federal Government for innocent victims of Federal law enforcement abuses" applies here. Law enforcement officers cannot escape liability by recruiting civilians to do their dirty work.

As the district court noted, there appears to be no circuit law on point. The Eleventh circuit has dealt with the opposite situation where non-enforcement individuals tricked members of law enforcement into an arrest. *See Metz v. United States*, 788 F.2d 1528, 1531–32 (11th Cir. 1986) (holding "that the provision permitting governmental liability on the basis of actions of law enforcement officers cannot be expanded to include governmental actors who procure law enforcement actions, but who are themselves not law enforcement officers").

Although there is no FTCA law on point, principles of Fourth Amendment law bolster our interpretation of the statute. The Fourth Amendment covers only government, not private, conduct, yet the Supreme Court has held that it prohibits unreasonable intrusions by private individuals who are acting as government instruments or agents. *See Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The Ninth Circuit has adopted a test for determining whether "a private individual is acting as a governmental instrument or agent for Fourth Amendment purposes." *United States v. Reed,* 15 F.3d 928, 931 (9th Cir. 1994). A court must ask: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *Id.* These factors, although intended for Fourth Amendment analysis, are useful in determining whether Sosa acted as an agent or instrumentality of the DEA law enforcement agents when he arrested and kidnaped Alvarez. The government admits that it knew of and acquiesced in the plan to kidnap Alvarez and bring him to the United States. Sosa performed the search to assist the DEA agents. Sosa had no individual interest in kidnaping Alvarez other than to curry favor with the DEA agents in the hopes that they would reward him. Therefore, because Sosa acted merely as an agent or instrument for "law enforcement officers," the United States has waived sovereign immunity.

### 2. Merits of False Arrest Claim

▮ The FTCA states that the liability of the United States should be determined "in accordance with the law of the place where the [allegedly tortious] act or omission occurred." 28 U.S.C. § 1346(b) (1993). The parties agree that, assuming

the foreign claims exclusion act does not apply, California law should apply here. "Under California law, the torts of false arrest and false imprisonment are not separate torts, as false arrest is 'but one way of committing a false imprisonment.'" *Watts v. County of Sacramento,* 256 F.3d 886 (9th Cir.2001) (quoting *Asgari v. City of Los Angeles,* 15 Cal.4th 744, 63 Cal. Rptr.2d 842, 937 P.2d 273, 278 n. 3 (1997)). "A cause of action for false imprisonment based on unlawful arrest will lie where there was an arrest without process followed by imprisonment." *Watts,* 256 F.3d 886 (citing *City of Newport Beach v. Sasse,* 9 Cal.App.3d 803, 88 Cal.Rptr. 476, 480 (1970); *Dragna v. White,* 45 Cal.2d 469, 289 P.2d 428 (Cal.1955)). False imprisonment "consists of the nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." *Scofield v. Critical Air Medicine, Inc.,* 45 Cal.App. 4th 990, 1000, 52 Cal.Rptr.2d 915 (1996).

### a. Authorization for arrest under federal law

Federal law did not give the DEA agents or Sosa "lawful privilege" to arrest Alvarez in Mexico. To determine whether a federal officer had lawful authority to carry out an arrest, a California court would first ask whether the arrest was authorized under federal law. *See Rhoden v. United States,* 55 F.3d 428, 431 (9th Cir.1995). Because Sosa acted as an agent or instrumentality for federal officers and had no independent authority for arresting Alvarez, we must ask whether the federal officers would have been authorized to arrest Alvarez.

The statute authorizing DEA enforcement neither expressly confers extraterritorial authority to the DEA nor expressly restricts its authority to the United States. We have held that agents of the Immigra-

tion and Naturalization Service ("INS") have the authority to conduct law enforcement activity outside the United States, even when Congress has not explicitly and directly conferred it on them, because Congress "has delegated broad enforcement powers to the Attorney General, who in turn has delegated those powers to the Commissioner of the INS, who in turn is authorized to delegate those powers to INS agents." *See United States v. Chen*, 2 F.3d 330, 333 (9th Cir.1993).

The Government argues that the DEA, like the INS, has extraterritorial authority. Indeed, Congress also drew the DEA's powers broadly. *See, e.g.*, 21 U.S.C. § 878(a)(3) (1999) (authorizing a DEA agent to "make arrests without warrant ... for any felony, cognizable under the laws of the United States, if he has probable cause to believe that the person to be arrested has committed or is committing a felony"); 21 U.S.C. § 878(a)(5) (authorizing the DEA to "perform such other law enforcement duties as the Attorney General may designate").

In other statutes where extraterritorial application was not explicit, courts have found it to be implied. *See, e.g., United States v. Cotten*, 471 F.2d 744, 751 (9th Cir.1973) (holding that "when a citizen of this country, while without the territorial jurisdiction of the United States, violates [a federal statute prohibiting the theft of government property], he is amenable to resulting criminal prosecution in United States District Courts"). The Government contends that substantive criminal statutes also indicate that Congress intended the DEA's authority not to be limited to the United States. *See, eg.*, 18 U.S.C. § 1201(e)(1) (2000) (giving the United States jurisdiction over kidnaper of internationally protected federal representatives, officers, or employees outside the United States).

As the Government also notes, other statutes appear to envision foreign law enforcement activity. Congress has authorized the military to supply equipment and assistance to federal law enforcement officers in a variety of extraterritorial operations, for example "the rendition of a suspected terrorist from a foreign country to the United States to stand trial." 10 U.S.C. § 374(b)(1)(D) (2001 Supp.). *See also* 18 U.S.C. §§ 351(g) (2000) (authorizing the military to assist in investigating kidnapings or assassinations of Congressional, Cabinet, and Supreme Court members) and 351(i) (2000) (providing for extraterritorial jurisdiction over the kidnaping and assassinations).

The Government contends that "in order for the DEA and other federal law enforcement agencies to fully execute [criminal] statutes, its arrest authority must have an equivalent extraterritorial scope." The Office of Legal Counsel used the same reasoning in an unpublished opinion, which discussed the authority of the Federal Bureau of Investigation to override international law to conduct extraterritorial law enforcement activities. *See* 13 Op. Off. Legal Counsel 163 (1989).

If this assertion is an accurate statement of United States law, then it reinforces the critics of American imperialism in the international community. An alternative interpretation would suppose that Congress intended for federal law enforcement officers to obtain lawful authority, which, for example, here might be a Mexican warrant, from the state in which they sought to arrest someone. *See* 10 U.S.C. § 374(b)(1)(D) (2001 Supp.) (providing that United States military assistance in rendering suspected terrorists to stand trial be "in accordance with other applicable law").

■ This reading of the DEA's authority complies with the United States' obligations under the 1988 United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, which provides that:

2. Parties shall carry out their obligations under this Convention in a manner consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States.

3. A Party shall not undertake in the territory of another Party the exercise of jurisdiction and performance of functions which are Exclusively reserved for the authorities of that other Party by its domestic law.

Art. 2(2)-(3), S. Treaty Doc. No. 4, 101st Cong., 1st Sess. 7, entered into force for the United States Nov. 11, 1990, reprinted in 28 I.L.M. 497 (1989). Therefore, we hold that there was no lawful federal authority for Alvarez's kidnaping.

**b. Authorization for arrest under California law**

■ Nor did the officers or Sosa have lawful authority under California law to arrest Alvarez in Mexico. The district court held that even if the DEA did not have statutory authority to make an arrest on foreign soil, Alvarez's apprehension in Mexico was still not a "false arrest" under California law because it was something akin to a citizen's arrest. *See Padilla v. Meese*, 184 Cal.App.3d 1022, 229 Cal.Rptr. 310, 316 (1986) (holding that "[w]here an officer acts outside the scope of his statutory authority an arrest is not necessarily rendered unlawful" because it may be a lawful citizen's arrest).

■ However, the district court erred in turning to the law of citizen's arrests. We have held that "the proper source for determining the government's liability [for false imprisonment by IRS officers under the FTCA] is not the law of citizen's arrests, but rather the law governing arrests pursuant to warrants." *Arnsberg v. United States*, 757 F.2d 971, 979 (9th Cir.1985). In *Arnsberg*, the court reasoned that IRS agents had "law enforcement obligations, such as the duty to execute warrants, which private citizens lack," which made "the law of citizen arrests an inappropriate instrument for determining FTCA liability." *Id.* at 979. DEA agents Gruden, Lawn, Waters, and Berrellez, also had law enforcement obligations, including the duty to execute warrants, which private citizens lack. *See* 21 U.S.C. § 878(2) (1999).

Ultimately, the *Arnsberg* court rejected the plaintiff's claim of false imprisonment under the FTCA because the agents, having attempted but failed to effect personal service and having followed the advice of a United States Attorney, "acted nearly perfectly," made only a "relatively minor and a relatively technical" error, and acted properly under the general common law. *Arnsberg*, 757 F.2d at 979. The officers here did not act "nearly perfectly." They arranged the kidnaping of Alvarez outside of the jurisdiction of their United States warrant. The warrant did not suffer from "relatively minor" or "relatively technical" defects. While valid on its face, it simply had no effect in Mexico. The invalidity of the warrant for the purposes of Alvarez's arrest meant that the DEA agents did not act properly under the general common law. As the *Arnsberg* court noted, according to the Restatement (Second) of Torts, §§ 122–24 (1965), "an arrest is privileged if it is made pursuant to a warrant which is regular in form and which reasonably appears to have been issued by a court with jurisdiction." *Id.* Here, the Los Angeles court was of competent jurisdiction to issue a warrant for the arrest of an individual in the United States, but had no juris-

diction to issue a warrant for an arrest in Mexico. *See* Fed.R.Crim.P. 4(d)(2).

### C. California Statutory Immunities

 To the extent that the district court's opinion can be read to suggest that the DEA defendants were immune from a suit under the FTCA due to California statutory immunities, it is incorrect.[3] A number of cases have rejected attempts to limit FTCA liability based on state immunities. In *United States v. Muniz*, the Supreme Court rejected the application of state immunity for jailers in an FTCA suit. *See United States v. Muniz*, 374 U.S. 150, 164–66, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). The Court explained: "we think it improper to limit suits by federal prisoners because of restrictive state rules of immunity." *Id.* at 164–65, 83 S.Ct. 1850. *See also Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). Similarly, "[t]he Ninth Circuit has refused to grant immunity to federal officers based on state statutes that confer public entity immunity for the conduct of government employees in an action against the United States under the FTCA." *Stuart v. United States*, 23 F.3d 1483, 1488 (9th Cir.1994). In *Stuart*, we held that a California statute that gave public entity

immunity for peace officers in vehicular pursuits did not provide immunity to the United States in action under FTCA. *See id.* Because state privileges do not bar holding federal officers liable under the FTCA, the Court need not decide whether the arrest was privileged under California law.

Therefore, we hold that the arrest of Alvarez was a "false arrest," for which the United States is liable under the FTCA.

### Choice of Law for ATCA Damages

 The district court did not err in choosing to apply the federal common law rather than Mexican law in determining the amount of damages to award Alvarez for his ATCA claim against Sosa. This Court reviews de novo the district court's decision concerning the appropriate choice of law. *Abogados v. AT & T, Inc.*, 223 F.3d 932, 934 (9th Cir.2000). The district court applied federal common law because it concluded that applying Mexican law, which would limit the amount of damages and prevent the consideration of punitive damages, would "inhibit the appropriate enforcement of the applicable international law or conflict with the public policy of the United States." It explained that "the use of federal common law remedies, including

---

**3.** It appears that the district court did not hold that the DEA officers were immune. It noted that the parties were confusing matters by discussing immunity, because the defendants were not arguing that they were immune under state law, but rather that the arrest was not unlawful under state law. Despite arguing that immunity was not at issue, the district court suggested that it believed the officers could be immune from FTCA liability under state law. The court described *Ting v. United States*, 927 F.2d 1504, 1514 (9th Cir. 1991) and *Arnsberg v. United States*, 757 F.2d 971 (9th Cir.1985) as cases in which the Ninth Circuit had applied state immunity principles to a claim of false arrest under the FTCA. The district court also declared that *Ting* "directly govern[ed]" Alvarez's case. As

Alvarez notes, the *Ting* court did not decide whether state immunities under Cal. Civ. Cod § 43.55 could bar FTCA claims. Instead, it based its holding on the absence of malice, a requirement for the claim of false arrest. *See Ting* 927 F.2d at 1514. Nor does *Arnsberg* stand for the proposition that state immunities could bar an FTCA claim. In *Arnsberg*, the Court held that IRS agents who consulted with an assistant United States Attorney before they sought the warrant and could reasonably rely on the attorney's belief that the arrest was legal were insulated by qualified immunity under federal law in a Bivens action for executing invalid material witness arrest warrant, but that state citizen's arrest law did not apply. *Arnsberg*, 757 F.2d at 979, 981.

the possibility of punitive damages, best serve[d] the end of the Alien Tort Claims Act."

Sosa maintains that the district court should have used Mexican law because the injury occurred in Mexico. Federal common law determines the choice of law rule, because the court heard the case under its federal question jurisdiction. *See Schoenberg v. Exportadora de Sal, S.A.,* 930 F.2d 777, 782 (9th Cir. 1991). Federal common law follows the Restatement (Second) of Conflict of Laws ("Restatement of Conflicts"). *See id.* Sosa cites the Restatement provision on personal injuries for his claim that "there is a presumption that the law of the place where the injury occurs applies." *See* Restatement of Conflicts § 146. However, the Restatement does not classify this case as a personal injury case. Comment b to § 146 explains that

> A personal injury may involve either physical harm or mental disturbance, such as fright and shock, resulting from physical harm or from threatened physical harm or other injury to oneself or to another. On the other hand, injuries to a person's reputation or the violation of a person's right of privacy are not "personal injuries" in the sense here used.

*Id.* (citations and internal quotations omitted). Alvarez's claim is not based on the assaultive physical or mental harm suffered, but rather on the deprivation of his rights to be free from arbitrary arrest, to liberty, to remain in his country, and to freedom of movement.

Thus, the general principle on conflict of laws for tort claims is more useful here. Under the General Principle for torts announced in the Restatement of Conflicts § 145;

> The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

The Restatement of Conflicts § 6 provides a list of factors to be used to determine the appropriate rule of law, which include:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement of Conflicts § 6.

Applying the § 6 factors to this case favors the choice of federal common law. The needs of the international system are too complex to dictate clearly the choice of either Mexican or federal common law. However, it is difficult to deny that encouraging states and individuals to comply with international law is beneficial and that damages for torts committed in violation of international law will encourage compliance. The United States, in enacting the ATCA, has expressed a policy to provide a cause of action and a federal forum to fashion remedies for violations of international law. *See Abebe–Jira,* 72 F.3d at 848. The United States has an interest in other states' respecting the human rights of its citizens. Mexico has an interest in the United States doing the same. Moreover, "[s]ince it is the plaintiff[ ] and not the defendants who [is] the Mexican resi-

dent[ ] in this case, Mexico has no interest in applying its limitation of damages— Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican [sic] defendants." *Hurtado v. Superior Court of Sacramento County*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). Because this is an action in tort, not contract, the justified expectations factor does not apply. *See Lange v. Penn. Mut. Life Ins. Co.*, 843 F.2d 1175, 1180–81 (9th Cir.1988).

The remaining § 6 factors also favor the application of federal common law. The basic policies underlying international human rights law would be enhanced by selecting the stronger federal common law of damages. Potential violators of human rights norms should know that they will pay for their actions. Choosing federal common law enhances the certainty, predictability, and uniformity of damage awards under the ATCA, because the remedy will not depend on the laws of the country in which a violation occurred. Finally, because United States courts have more experience in applying federal common law than Mexican law, it will be easier for them to determine and apply the familiar law. Applying Mexican law, the court would face both language barriers and the need to become familiar with a civil code system of law.

Caveat: the Restatement § 145 also provides "contacts to be taken into account in applying the principles of § 6 ..." It is less clear which laws these "contacts" favor. These contacts include:

 (a) the place where the injury occurred,

 (b) the place where the conduct causing the injury occurred,

 (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

 (d) the place where the relationship, if any, between the parties is centered.

Restatement of Conflicts § 145(2). The kidnaping occurred in Mexico. However, an important part of the conduct that caused the injury, the planning of the DEA, occurred in the United States. Alvarez and Sosa are both Mexican. Alvarez lives and works in Mexico. Although Sosa lived in Mexico before the kidnaping, he now lives in the United States. Nonetheless, we believe that the relationship between the parties is centered in the United States. Sosa abducted Alvarez pursuant to the agenda of United States DEA agents. The DEA agents wanted Alvarez apprehended in order to prosecute him in the United States for his alleged participation in the killing and torture of an American DEA agent in Mexico. In sum, although a case can be made for applying Mexican law, the district court did not err in choosing to apply federal common law.

### Scope of damages

We agree with the district court that Alvarez cannot recover damages for his entire imprisonment in the United States. Whether Alvarez can recover damages for the duration of his imprisonment in the United States is a question of law, and, therefore, is reviewed de novo. *See United States v. Stephens*, 237 F.3d 1031, 1033 (9th Cir.2001). As noted, in determining the scope of damages for Alvarez's ATCA claim, we look to federal law. By contrast, for Alvarez's FTCA claim, "the extent of the United States' liability under the FTCA is generally determined by reference to state law." *Molzof v. United States*, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992).

■■■ Although we have found neither federal nor state law cases that have dealt with the question whether an individual who has been kidnaped and brought to the United States for a criminal prosecution can recover damages for the duration of his imprisonment in the United States, we

agree with the district court that "the lawful arrest warrant and indictment broke the chain of causation from [Sosa]'s actions to [Alvarez]'s continuing injuries."

As the district court explained, the rationale of federal cases involving false arrest and imprisonment is useful here despite the uniqueness of the facts.· With respect to a § 1983 action based on false arrest, this Court has stated:

> Filing of a criminal complaint immunizes investigating officers such as the appellants from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that ·probable cause for an accused's arrest exists at that time.

*Smiddy v. Varney,* 665 F.2d 261, 266–67 (9th Cir.1981). In Alvarez's case, the DEA had an independent and lawful basis for Alvarez's arrest once he fell within the jurisdiction of the warrant and felony indictment.

Similarly, California courts have cut off liability for false arrest at the date of arraignment, *see County of Los Angeles v. Superior Court,* 78 Cal.App.4th 212, 92 Cal.Rptr.2d 668, 677 n. 4. (2000), but the reasoning for the cut-off differs from that of federal law, and Alvarez contends that it does not apply to this case.· In *Asgari v. City of Los Angeles,* 15 Cal.4th 744, 757, 63 Cal.Rptr.2d 842, 937 P.2d 273 (1997), the California Supreme Court held that Government Code § 821.6 precluded a plaintiff in a false arrest action from recovering for injuries attributable to the period of incarceration after his or her arraignment on criminal charges.

According to Alvarez, *Asgari* merely holds that Cal. Gov.Code § 821.6, which provides public employees with immunity from malicious prosecution actions, immunizes public employees from damages for false imprisonment from the time of lawful arraignment on.[4] As Alvarez notes, Sosa is not a public employee under § 821.6, because he is not an employee of a California state entity. *See Randle v. City and County of San Francisco,* 186 Cal. App.3d 449, 456, n. 6, 230 Cal.Rptr. 901, (1986) (noting that "The Government Code defines 'public employee' as 'an employee of a public entity,' (Section 811.4) and 'public entity' as including 'the State, the Regents of the University of California, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State.' (Section 811.2)"). Alvarez maintains that the rule of *Gill v. Epstein,* 62 Cal.2d 611, 617–18, 44 Cal.Rptr. 45, 401 P.2d 397 (1965), that imprisonment proximately caused by false arrest, including imprisonment after a lawful arraignment, is compensable as a "natural consequence of a false arrest" has survived *Asgari* and controls his case.

We agree with the district court that *Asgari* overruled *Gill.* The *Asgari* court's discussion of parallels to a New York case based on causation indicates that it meant for its holding to be read broadly. *Asgari* stated that its holding was consistent with *Broughton v. State. Broughton* 's limitation on liability was based not on state immunity principles, but rather on the grounds that "an action for false imprisonment redresses the violation of plaintiff's freedom of movement and not freedom from unjustifiable litigation, therefore[,] attorney's fees are not proximate after arraignment or indictment and hence not recoverable." *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 316 (1975); *see also County of Los*

---

4. The *Asgari* court also relied on Cal. Gov. Code § 820.4, which immunizes "public employees" from actions based on false arrest.

*Angeles v. Superior Court,* 78 Cal.App.4th 212, 92 Cal.Rptr.2d 668, 675 (2000) (explaining that *Asgari* overruled *Gill*). Therefore, we hold that *Asgari* is not limited to public employees. *Asgari* applies here, and Alvarez's damages are limited to his time in Mexico.

Accordingly, we AFFIRM the district court's judgment with respect to Sosa's liability under the ATCA, the substitution of the United States for the individual DEA defendants, the choice of federal common law to determine damages, and the limitation of damages to Alvarez's time in captivity in Mexico. However, we REVERSE the district court's dismissal of Alvarez's FTCA claims against the United States and REMAND the case for a determination of the United States' liability. The dismissal of Alvarez's claims against Garate–Bustamente is GRANTED. No party to recover costs on appeal.